IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

UNITED STATES OF AMERICA

v.                                  CRIMINAL CASE NO. 1:19-00308-001

JAN RUCKER

### MEMORANDUM OPINION AND ORDER

Before the court is the motion of defendant Jan Rucker to suppress all evidence seized from his vehicle pursuant to the search warrant granted and executed on August 30, 2019. (ECF No. 37.) The motion has been fully briefed, and the court held a hearing on August 17, 2020. At the conclusion of the hearing, the court **DENIED** defendant's motion, and briefly gave its reasons for so doing on the record. The court gives its reasons for denying the motion in full as follows.

### I.   Background[1]

Investigators with the Southern Regional Drug and Violent Crimes Task Force ("Task Force") began an investigation of a

---

[1] This background is based upon facts stated in defendant's brief, (ECF No. 37), the government's response, (ECF No. 38), the search warrant and the affidavit to the search warrant, (ECF No. 39), and the testimony at the pretrial motions hearing by Special DEA Agent Benjamin S. Henrich and by West Virginia Mercer County Sheriff's Deputy Matthew Hatfield. The court found Special Agent Henrich and Deputy Hatfield completely truthful and believable, and fully credited each of their testimonies.

drug trafficking organization ("DTO") headed by James Walker and others, responsible for distributing controlled substances.  In furtherance of this investigation, DEA agents sought authorization to intercept wire communications of targets involved in the DTO.  On or about August 5, 2019, United States District Judge Irene C. Berger signed an order authorizing the interception of wire communications of two separate phones being utilized by members of the Walker DTO.  One such phone was used by Keith Blakely, who was a member of the DTO and was charged as a result of this investigation through a separate indictment.

On August 30, 2019, Task Force agents were intercepting and monitoring calls made to and from the phone utilized by Blakely. During the monitoring, agents intercepted a caller (later identified as defendant Rucker) who was attempting to make a purchase of a large quantity of schedule II pills.  Blakely and the then-unidentified caller made several calls throughout the early morning hours of August 30, discussing the price and quantity of the drug transaction and scheduling a meeting time and place.[2]

---

[2] At the hearing, Special DEA Agent Benjamin S. Henrich testified that on August 30, 2019, Blakely communicated about likely drug transactions with three people.  He explained that two of the three persons communicating with Blakely that day did so on devices already known to law enforcement, and the investigative team knew their identities and recognized them when they met with Blakely that day.  The third person was then-unidentified to law enforcement, and turned out to be the defendant.  Based

Based on the substance of the intercepted calls, case agents set up surveillance at the location being discussed between Blakely and then-unidentified caller.  In the intercepted calls, at approximately 11:30 a.m. on August 30, 2019, Blakely advised the then-unidentified caller to "Pull up on Wash. Pull up on Wash and um, pull up in the back and just, um come across."  The then-unidentified caller replied, "Alright, I got you."

At approximately 12:40 p.m. on August 30, 2019, agents observed a Ford F-150 driven by defendant arrive at Belcher's Mobile Home Park near 851 Washington Avenue, Princeton, West Virginia.  Defendant "pulled up in the back" of the trailer park and parked his truck on Hall Court.  Special DEA Agent Henrich testified that Hall Court is reasonably understood to be the area in the back of the trailer park.  After parking, defendant got out of his truck, walked approximately fifty yards, and entered a trailer marked "The Office."  Case agents previously observed Blakely arrive at the same location and enter the same trailer prior to defendant's arrival.  Agents knew of Blakely's involvement in the DTO from previous interceptions of wire communications and controlled drug buys.

---

on this testimony, which the court found fully credible, the court finds there is no reasonable probability that defendant was confused with the two other persons communicating and meeting with Blakely about likely drug transactions that day.

3

Defendant left the trailer after meeting with Blakely for a short time and returned to his truck.  Agents observed defendant sitting in his truck a few minutes before he left the area.  Defendant was not observed meeting with anyone else at this time.   After leaving the meeting with Blakely, given Blakely's known business as a drug dealer and based upon the substance of the intercepted calls between Blakely and the then-unidentified caller, it was the belief of the agents that defendant was the unidentified caller and defendant had just participated in a drug transaction.

A member of the Mercer County Sheriff's Department, Deputy Matthew Hatfield, was directed by a Task Force agent to follow and conduct a stop on the defendant.  Deputy Hatfield, whose testimony the court finds fully credible, testified that he pulled behind defendant's truck and was driving "fairly close" behind defendant when he observed defendant fail to give a proper turn signal.  Deputy Hatfield then conducted a traffic stop on defendant's truck for the observed vehicle code violation.  After the stop, defendant was detained for approximately ten minutes before he was taken to the police station.  At some point soon thereafter, a drug dog arrived at the scene where defendant's truck remained, and the drug dog alerted to presence of an odor of a controlled substance.  During this same time period, case agents called the phone

4

number of the then-unidentified phone that was intercepted communicating with Blakely that morning, and a phone inside defendant's truck rang.

Before searching defendant's truck, the agents applied for a search warrant for the truck. United States Magistrate Judge Dwane L. Tinsley reviewed the affidavit and application for search warrant and found that probable cause existed to search defendant's truck. Upon execution of the search warrant, agents found two firearms, 507 hydromorphone pills, six suboxone strips, and $1,543 in cash.

Defendant moved to suppress the evidence found pursuant to the search warrant on two grounds. First, defendant argued that officers did not have reasonable suspicion to stop his vehicle on August 30, 2019, and thus the stop was unlawful. He contended that the officers had no way of knowing that he was the person on the phone communicating with Blakely. Defendant also explained that while police officers said they pulled defendant over because he failed to properly use his turn signal, failure to signal alone is not sufficient to warrant a traffic stop under West Virginia law. Second, defendant argued that because the stop was unlawful, the evidence gained from the stop that was used as the basis for the search warrant (defendant's cell phone ring inside his car and the drug dog's alerting to the presence of narcotics) was impermissible. Then,

5

after excluding this impermissible evidence, defendant argued that the search warrant is not based upon probable cause and thus the evidence gained pursuant to that search warrant should be suppressed.

## II. Analysis

### A. The Traffic Stop

There are two alternative grounds that would support a finding that officers conducted a valid traffic stop on defendant. The first ground is if the traffic stop for failure to signal was a valid traffic stop under West Virginia law. The second ground is if, when the officers conducted the traffic stop, the officers possessed reasonable suspicion that defendant had engaged in criminal activity.

On the first ground, under West Virginia law, "failure to signal alone is not sufficient to warrant a traffic stop; rather, traffic must also be affected by the movement of the motorist's vehicle." Teas v. McCallen, 2013 WL 2422783, at *10 (N.D.W. Va. June 3, 2013) (citing Clower v. West Virginia Dept. of Motor Veh., 678 S.E.2d 41 (W. Va. 2009)). Here, Deputy Hatfield testified that he was following "fairly close" behind defendant when defendant failed to signal before turning. However, he also testified that the light was green and defendant was in a right turn lane before turning, and he did not testify that his driving or other traffic was affected by

6

defendant's failure to signal.  Thus, there is insufficient evidence in the record that leads to a finding that traffic was affected.  Compare with United States v. Starling, 2011 WL 5445351, at *7 (N.D.W. Va. Nov. 9, 2011) (finding the stop lawful because "Patrolman Chrisman testified that he had been affected by the defendant's failure to signal . . . because he had to apply his brakes when the defendant made the turn without any notice"); Teas, 2013 WL 2422783, at *10 (finding the stop lawful because the officers detailed in their criminal complaint that traffic was affected by the failure to signal).  Thus, the court found that the traffic stop in this case may not lawfully be based upon Deputy Hatfield's observation that defendant failed to signal before turning.

However, on the second ground, the court found that reasonable suspicion to conduct the traffic stop upon defendant exists separate and apart from his failure to signal.  The Fourth Circuit employs an objective test for assessing whether a vehicle stop for a minor traffic violation is pretextual.  See United States v. Kellam, 568 F.3d 125, 136 (4th Cir. 2009).  "Under this test, 'if an officer has probable cause or a reasonable suspicion to stop a vehicle, there is no intrusion upon the Fourth Amendment.  That is so regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity.'"  Id.

7

(quoting United States v. Hassan El, 5 F.3d 726, 730 (4th Cir. 1993)). "In order to demonstrate reasonable suspicion, a police officer must offer 'specific and articulable facts' that demonstrate at least 'a minimal level of objective justification' for the belief that criminal activity is afoot." United States v. Branch, 537 F.3d 328, 337 (4th Cir. 2008) (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)).

Here, Deputy Hatfield had reasonable suspicion that defendant was engaged in criminal activity based upon specific and articulable facts.[3] In the intercepted calls, Blakely advised the then-unidentified caller to "Pull up on Wash. Pull up on Wash and um, pull up in the back and just, um come across." Based upon Special DEA Agent Henrich's testimony explaining the meaning of "Wash." and how parking in Hall Court comports with "pull[ing] up in the back," defendant's conduct is consistent with these instructions. Soon after the directions

---

[3] Deputy Hatfield testified that he does not remember whether the Task Force agent fully explained to him the information that the Task Force agents had gathered from the intercepted phone messages and physical surveillance of defendant. Thus, it is unclear whether Deputy Hatfield personally had the knowledge base to generate reasonable suspicion of defendant's drug trafficking criminal activity. Regardless, through the collective knowledge doctrine, the Task Force agent's knowledge may be imputed to Deputy Hatfield in this case. See United States v. Massenburg, 654 F.3d 480, 494 (4th Cir. 2011) ("[T]he collective-knowledge doctrine simply directs us to substitute the knowledge of the instructing officer or officers for the knowledge of the acting officer.").

were given, officers observed a Ford F-150 being driven by defendant arrive at the trailer park near Washington Avenue. Defendant "pulled up in back" and parked his truck on Hall Court. He then got out of his truck, walked approximately fifty yards across the trailer park, and entered a trailer marked "The Office." Case agents had previously observed Blakely arrive at the same location and enter the same trailer prior to defendant's arrival.

   Based on these specific and articulable facts, Task Force agents had just observed what they believed to be a drug transaction between defendant and Blakely. Task Force agents witnessed a physical meeting between defendant and Blakely, a known drug dealer, and observed that defendant's course of conduct was consistent with the substance of the intercepted conversations between Blakely and the then-unidentified caller. Based upon these facts, officers had reasonable grounds to believe that a drug transaction had occurred and that defendant was the other person involved in the phone conversations with Blakely facilitating this drug transaction.

    In conclusion, the physical observations of defendant's meeting with Blakely and the substance of the intercepted conversations between Blakely and defendant serve as articulable facts creating reasonable suspicion that defendant had just engaged in a drug transaction. Therefore, the traffic stop

9

effectuated on defendant was based upon reasonable suspicion that a crime had been committed, and the stop did not violate the Fourth Amendment.  For these reasons, the court concluded that the evidence gathered pursuant to this traffic stop should not be suppressed.

### B. The Search Warrant

Once the traffic stop had been found to not violate the Fourth Amendment, it is clear that the search warrant issued by Magistrate Judge Tinsley is valid under the Fourth Amendment. The search warrant is based on probable cause:  both the drug dog's alerting to the presence of narcotics in the vehicle and the confirmation that it was defendant who was the other party in the phone conversations with Blakely create probable cause that a drug trafficking crime had occurred.  See United States v. Green, 740 F.3d 275, 282 (4th Cir. 2014) ("Probable cause to conduct a search based on a drug-detection dog's alert exists when the totality of the circumstances, 'viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime'") (quoting Fla. v. Harris, 568 U.S. 237, 248 (2013)).

Furthermore, review of the probable cause determination by the judicial officer is to be shown "great deference." United States v. Blackwood, 913 F.2d 139, 142 (4th Cir. 1990).  "[T]he task of a reviewing court is not to conduct a de novo

10

determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." Massachusetts v. Upton, 466 U.S. 727, 728 (1984). Here, it is evident that substantial evidence exists supporting Magistrate Judge Tinsley's finding of probable cause. Therefore, the court concluded that the evidence gathered pursuant to the search warrant should not be suppressed.

### III. Conclusion

The initial traffic stop upon defendant was lawful because it was conducted based upon reasonable suspicion, and the search warrant was lawful because it was based upon probable cause. For the foregoing reasons, the evidence recovered pursuant to the search warrant should not be suppressed, and defendant's motion to suppress, (ECF No. 37), is **DENIED**.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to all counsel of record, the United States Marshal for the Southern District of West Virginia, and the Probation Office of this court.

IT IS SO ORDERED this 18th day of August, 2019.

                                      **ENTER:**

                                      David A. Faber
                                      Senior United States District Judge